IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA

v.                                                      CRIMINAL NO. 3:22-cr-076

JARED LEE SPICER, D.P.M.                                18 U.S.C. § 1349

**The United States Attorney Charges**:

At all times relevant to this **Information**:

## GENERAL ALLEGATIONS

### Defendant and Introduction

1.      **JARED LEE SPICER, D.P.M. ("SPICER")**, of Lafayette County, Mississippi, was a doctor of podiatric medicine licensed in the State of Mississippi who had the ability to prescribe medications and order diagnostic testing.

2.      As detailed herein, between approximately February 2017 and July 2020, **SPICER** conspired to and engaged in a scheme to defraud health care benefit programs, including the Medicare program ("Medicare"), of more than $2.5 million. To that end, **SPICER** and his co-conspirators fraudulently formulated, prescribed, dispensed, and billed health care benefit programs, including Medicare, for foot bath medications produced and dispensed to individuals, which circumvented federal regulations and approvals regarding use and efficacy, and which exploited the manner in which health care benefit programs reimbursed the dispensation of medications. In addition, **SPICER** and his co-conspirators targeted and solicited individuals to provide biological specimens, such as toenails, and performed, and caused to be performed, medically unnecessary molecular diagnostic testing. Specifically, **SPICER** and his co-conspirators sold signed doctors' orders along with individuals' biological specimens to a

diagnostic laboratory, whereupon the laboratory performed medically unnecessary molecular diagnostic testing on the specimens and submitted false and fraudulent claims to Medicare and other health care benefit programs. In exchange for his participation in the scheme, **SPICER** solicited and received kickbacks and bribes from a purported marketer acting on behalf of various pharmacies and diagnostic laboratories.

3.      Between approximately February 2017 and July 2020, **SPICER** and his co-conspirators caused pharmacies with which they had financial relationships to submit false and fraudulent claims to health care benefit programs, including Medicare, in the amount of more than $700,000 and were reimbursed more than $700,000. Between approximately April 2018 and July 2020, **SPICER** and his co-conspirators caused the relevant diagnostic laboratory to submit more than $1.8 million in false and fraudulent claims to health care benefit programs, including Medicare, for medically unnecessary molecular diagnostic testing and was reimbursed more than $250,000.

### Health Care Benefit Programs and Claims Submission Process

4.      Medicare was a federally funded health insurance program that provided health benefits to individuals who were 65 years of age or older or disabled. Medicare was administered by the United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS").

5.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

6.      Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each beneficiary was given a unique Medicare identification number.

7.    Medicare covered different types of benefits, which were separated into different program "parts." Medicare Part A covered hospital inpatient care; Medicare Part B covered physicians' services and outpatient care; Medicare Part C covered Medicare Advantage Plans; and Medicare Part D covered prescription drugs.

8.    Physicians, clinics, and other health care providers, including pharmacies and laboratories (collectively, "providers"), that provided services to beneficiaries, could enroll with health care benefit programs, including Medicare, and provide medical services to beneficiaries. Providers were able to apply for and obtain a "provider number." Providers that received a Medicare provider number were able to file claims with Medicare to obtain reimbursement for benefits, items, or services provided to beneficiaries.

9.    When seeking reimbursement from Medicare for provided benefits, services, or items, providers submitted the cost of the benefit, item, or service provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology Manual. Additionally, claims submitted to Medicare seeking reimbursement were required to include: (a) the beneficiary's name and Health Insurance Claim Number; (b) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (c) the name of the provider, as well as the provider's unique identifying number, known either as the Unique Physician Identification Number or National Provider Identifier. Claims seeking reimbursement from Medicare could be submitted in hard copy or electronically.

**Medicare Part B**

10.    Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for

Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for benefits, items, or services rendered to beneficiaries.

11.   Novitas Solutions Inc. ("Novitas") was the MAC for consolidated Medicare jurisdictions JH and JL, which included Louisiana, Mississippi, Oklahoma, Texas, and Pennsylvania.

12.   To receive Medicare reimbursement, providers needed to have applied to the MAC and executed a written provider agreement. The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider. CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

13.   In executing CMS Form 855B, providers further certified that they "w[ould] not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare" and "w[ould] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

14.   Payments under Medicare Part B were often made directly to the providers rather than to the patient or beneficiaries. For this to occur, beneficiaries would assign the right of payment to providers. Once such an assignment took place, providers would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

**Medicare Part D**

15.     In order to receive Part D benefits, a beneficiary enrolled in a Medicare drug plan. Medicare Part D drug plans were operated by private health insurance companies approved by Medicare and referred to as drug plan "sponsors." A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

16.     CMS compensated the Medicare sponsors for providing prescription drug benefits to beneficiaries. CMS paid Medicare sponsors a monthly capitation fee for each beneficiary enrolled in the Medicare sponsors' plans. In addition, in some cases where a Medicare sponsor's expenses for a beneficiary's prescription drugs exceeded that beneficiary's capitation fee, CMS reimbursed the Medicare sponsor for a portion of those additional expenses.

17.     Typically, Medicare did not process its insureds' prescription claims directly. Instead, Medicare's drug plans were administered by Pharmacy Benefit Managers ("PBMs"), whose responsibilities included adjudicating and processing payment for prescription drug claims submitted by eligible pharmacies. PBMs also audited participating pharmacies to ensure compliance with their rules and regulations.

18.     A pharmacy could participate in the Part D program by entering into a provider agreement with a Part D drug plan or with a PBM. Pharmacies entered into contractual agreements with PBMs either directly or indirectly. If indirectly, providers first contracted with pharmacy network groups, which then contracted with PBMs on behalf of providers. By contracting with drug plans or PBMs, directly or indirectly, pharmacies agreed to comply with all applicable laws, rules, and regulations, including all applicable federal and state anti-kickback laws.

5

19.     Upon receiving prescriptions for beneficiaries, pharmacies submitted claims to Medicare or to PBMs for dispensing prescription drugs.   Medicare or PBMs reimbursed pharmacies at specified rates, minus any copayments to be paid by beneficiaries.

20.     Under the Social Security Act, Medicare covered Part D drugs that were dispensed upon a valid prescription and for a "medically accepted indication." 42 U.S.C. § 1395w-102(e). Medicare generally did not cover drugs meant for prevention of disease and only covered drugs meant to treat an existing illness or injury.

### Foot Bath Medications

21.     To be reimbursed for medications, pharmacies submitted claims to insurance companies identifying each drug ingredient dispensed, including each drug's National Drug Code ("NDC") number, and were reimbursed accordingly.

22.     Health care benefit programs or PBMs typically reimbursed pharmacies the Average Wholesale Price ("AWP") of each drug ingredient dispensed, minus any negotiated discount.  AWP referred to the average price at which drugs or drug ingredients were sold at the wholesale level.  Drugs or drug ingredients with NDC numbers that reimbursed at high rates were called "high-adjudication."

23.     Podiatrists sometimes prescribed high-adjudication antibiotic and antifungal drugs ("high-adjudication foot bath medications") along with a plastic foot tub and instructing the beneficiary to compound the drugs themselves at home by mixing the medications with warm water in order to soak their feet.

24.     These high-adjudication foot bath medications were prescribed, purportedly, to treat a variety of fungal, bacterial, or other types of foot infections, and routinely included vancomycin 250 milligram capsules, calcipotriene 0.005% cream, clindamycin phosphate 1%

solution, ketoconazole 2% cream, and other expensive drugs. Typically, the drugs selected for use in foot baths did not require pre-authorization from Medicare prior to prescribing them to a beneficiary. Additionally, the majority of these drugs were not subject to utilization management, meaning that there was no limit on the quantity of drugs that could be ordered in a single prescription.

25. In late 2019, Medicare, private insurers, and others issued alerts regarding a pervasive scheme to defraud involving foot baths. On November 20, 2019, CMS issued an Alert on "Foot Baths and Soaks." The Alert, which was sent to the Medicare Part D plans, stated that CMS "has been made aware of questionable prescribing and dispensing of multiple drugs (typically antibiotics and antifungal medications) that are being used in a foot bath. Beneficiaries are provided a foot spa free of charge, with instructions from the pharmacy to mix the medications with water in order to soak their feet." According to CMS, "[t]hese high-reimbursable medications . . . are often dispensed without medical necessity or pursuant to true medical relationships. In addition, they may be of limited clinical value and may be harmful to patients, if used as dispensed." The drugs "are typically provided monthly and are of limited clinical effectiveness in the manner they are being utilized by the beneficiaries. Drugs such as oral capsules, ointments, and injections may be dispensed to beneficiaries to combine in the footbath. These drugs may have limited ability to work topically in a footbath as prescribed and dispensed."

26. Further, "[p]otential patient harm is a significant concern for these unapproved treatments. Topical soaks are not the standard of care in treatment of foot infections . . . and could be actively harmful to the healing process." "In addition, harm can occur through patients being confused regarding atypical directions for drug products which conflicts with typical drug information." For example, "a beneficiary may mistakenly ingest vancomycin capsules orally. . .

7

because this is the usual route of administration," but such could cause "symptoms such as abdominal pain, nausea, and diarrhea by overgrowth of abnormal bacteria." An "additional example is the development of systemic vancomycin resistance in a beneficiary through topical absorption in open wounds who may later need vancomycin for system intravenous (IV) use for a life threatening infection."

27. In sum, "[t]he purported indications for use of these combinations used in this manner, may not be medically accepted indications (MAIs) and are, at best, investigative and experimental treatments."

28. Following the issuance of the CMS Alert and other alerts, health care benefit programs began limiting coverage of high-adjudication foot bath medications and auditing providers who were identified as high prescribers of such medications.

### Molecular Diagnostic Testing

29. Molecular diagnostic tests were laboratory tests that used polymerase chain reaction testing and metagenomics to extract DNA from fungi to determine whether different types of bacteria are present in the specimen provided.

30. Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 13957(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1).

31. To conduct molecular diagnostic testing, a laboratory had to obtain a biological specimen from the patient. One way to obtain a biological specimen was to obtain nail clippings

from a patient, and another way was to take a culture of a patient's wound. The biological specimen was then submitted to the diagnostic laboratory to conduct testing.

32.     Biological specimens were submitted along with requisitions, or doctors' orders, that identified the patient, the patient's insurance, and indicated the specific tests to be performed. In order for laboratories to submit claims to Medicare for molecular diagnostic tests, the requisitions had to be signed by a physician or other authorized medical professional, who attested to the medical necessity of the test.

## Relevant Entities

33.     North Mississippi Foot Specialists, P.C. ("NMFS"), formed in 2002 and located in Lafayette County, Mississippi, was a medical clinic that provided, among other services, podiatry treatment to beneficiaries. In July 2016, NMFS opened a community pharmacy by the same name within the medical clinic that later was renamed and formed as Oxford Premier Pharmacy, LLC. NMFS contracted with Medicare and Medicare sponsors to provide health care items and services to beneficiaries.

34.     Oxford Premier Pharmacy, LLC ("Oxford Premier Pharmacy"), formed in 2019 and located Lafayette County, Mississippi, was a community pharmacy located within NMFS.

35.     Pharmacy 1, formed in 2017 and located in East Baton Rouge Parish and Jefferson Parish, Louisiana, was an open-door retail and mail-order pharmacy that specialized in the production and dispensation of high-adjudication foot bath medications and other high-adjudication medications.

36.     Laboratory 1, formed in 2017 and located in Henrico County, Virginia, was an independent diagnostic laboratory.

9

**Relevant Individuals**

37.    Logan Hunter Power ("Power"), of Lafayette County, Mississippi, solicited and recruited practitioners to write prescriptions for high-adjudication foot bath medications and other high-adjudication medications to be referred to various pharmacies and recruited practitioners to submit doctors' orders and biological specimens to various diagnostic laboratories, through his company, Power Medical, LLC.

38.    Carey "Craig" Williams, D.P.M. ("Williams"), of Yalobusha County, Mississippi, was a podiatrist licensed to practice in the State of Mississippi who had the ability to prescribe medications and order molecular diagnostic testing, and who owned, operated, and worked at NMFS.

## COUNT 1

### The Conspiracy and Its Object

39.    Paragraphs 1 through 38 of this Information are re-alleged and incorporated by reference as though fully set forth herein.

40.    Beginning in or around February 2017, and continuing through in or around July 2020, in Lafayette County, in the Northern District of Mississippi, and elsewhere, the defendant,

**JARED LEE SPICER, D.P.M.,**

did knowingly and willfully, that is with the intent to further the object of the conspiracy, conspire and agree with Power, Williams, and others known and unknown to the United States Attorney, to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare and other health care benefit programs, and to obtain, by means of material false and fraudulent pretenses, representations, and promises, money owned by and under the custody and control of Medicare

10

and other health care benefit programs, in connection with the delivery of and payment for health care benefits and services, in violation of Title 18, United States Code, Section 1347.

## Purpose of the Conspiracy

41.     It was a purpose of the conspiracy for **SPICER** and his co-conspirators to unlawfully enrich themselves by, among other things: (a) soliciting and receiving kickbacks and bribes in exchange for ordering and arranging for the ordering of high-adjudication foot bath and other medications to be dispensed to beneficiaries and others by Oxford Premier Pharmacy, Pharmacy 1, and other pharmacies; (b) prescribing medically unnecessary high-adjudication foot bath medications and other medications to beneficiaries and others; (c) soliciting and receiving kickbacks and bribes in exchange for ordering and arranging for the ordering of molecular diagnostic testing to be completed by Laboratory 1 and other laboratories; (d) ordering medically unnecessary molecular diagnostic testing to be performed on biological specimens of beneficiaries and others; (e) causing the submission of false and fraudulent claims to Medicare and its sponsors; (f) concealing and causing the concealment of false and fraudulent claims to Medicare and its sponsors; and (g) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

## Manner and Means

42.     The manner and means by which **SPICER** and his co-conspirators sought to accomplish the objects and purpose of the scheme and artifice included, among other things:

### Foot Bath Medications

a.      To maximize reimbursements from Medicare and its sponsors, NMFS and Oxford Premier Pharmacy dispensed high-adjudication medications in large quantities to be

dissolved in foot baths to beneficiaries and others, not based on evaluations of effectiveness or individualized patient need, but rather based on foot bath medications being high-adjudication.

       b.    Power was a medical sales representative who also made money by soliciting physicians to send prescriptions, doctors' orders, and biological specimens to Pharmacy 1, Laboratory 1, and other health care providers. Power was not a bona fide employee of these entities, but rather, received a percentage of the reimbursements paid to these entities by Medicare and other health care benefit programs for referring prescriptions to pharmacies and biological specimens and doctors' orders to laboratories.

       c.    Power sought out and formed relationships with pharmacies that dispensed high-adjudication foot bath medications and solicited **SPICER**, Williams, and others to refer prescriptions for high-adjudication foot bath medications to those pharmacies with which Power had relationships.

       d.    In or around January 2019, Power entered into a purported employment agreement with Pharmacy 1 whereby Power would refer prescriptions for high-adjudication foot bath medications to be filled by Pharmacy 1 in exchange for thirty percent of the reimbursements received by Pharmacy 1 for those prescriptions, including prescriptions for beneficiaries.

       e.    Pharmacy 1 created a series of preprinted, check-the-box prescription forms listing combinations of high-adjudication foot bath medications in order to encourage and direct practitioners to prescribe these specific high-adjudication combinations to beneficiaries and others, instructing beneficiaries and others to combine the medications themselves at home by mixing the medications into warm water in a foot bath provided by Pharmacy 1 and soaking their feet.

       f.    **SPICER** agreed with Power and Williams to prescribe high-adjudication foot bath medications to beneficiaries and others utilizing Pharmacy 1's preprinted prescription

forms in exchange for a percentage of the reimbursements paid to Pharmacy 1 by Medicare and other health care benefit programs for dispensing high-adjudication foot bath medications to beneficiaries and others.

g.   **SPICER** and Williams also prescribed high-adjudication foot bath medications to, and authorized refills for, beneficiaries and others who were patients of NMFS, and for beneficiaries and others regardless of whether the high-adjudication foot bath medications were medically necessary for the treatment of the individual patients.

h.   **SPICER** routinely prescribed high-adjudication foot bath medications in contravention of the medically intended and accepted use of such medications.  For example, vancomycin was an antibiotic intended to be taken orally for the treatment of a specific bacterial infection of the colon.  **SPICER** regularly prescribed vancomycin 250 milligram capsules in quantities of 360 capsules per prescription to patients who did not have a bacterial infection.

i.   Likewise, ketoconazole was an antifungal cream indicated to be applied topically for the treatment of athlete's foot and other fungal infections.  **SPICER** frequently prescribed 1,800 grams of ketoconazole cream, or approximately one tube of ketoconazole per day, and directed beneficiaries to squeeze half a tube into a foot bath and soak twice daily, despite ketoconazole not being water soluble.

j.   Despite knowing that remuneration could not be paid or received for referring prescriptions to Pharmacy 1 for beneficiaries, nevertheless, **SPICER** and Williams solicited and received remuneration, namely kickbacks and bribes, from Power in exchange for their referring prescriptions ordering the dispensing of high-adjudication foot bath medications to beneficiaries.

13

k.      Notwithstanding that beneficiaries had the ultimate choice in providers, including pharmacies, due to the kickbacks paid by Pharmacy 1 to practitioners and marketers, beneficiaries were denied the ability to choose which pharmacy, if any, they desired to actually fill their prescriptions.

l.      Upon receiving prescriptions authorized by **SPICER** and Williams, Oxford Premier Pharmacy and Pharmacy 1 submitted electronic claims to Medicare and its sponsors, through their respective PBMs, seeking reimbursement for the high-adjudication foot bath medications prescribed.

m.      Oxford Premier Pharmacy and Pharmacy 1 then dispensed, typically by mailing, high-adjudication foot bath medications to beneficiaries predicated upon prescriptions authorized by **SPICER** and Williams.

n.      Medicare reimbursed Oxford Premier Pharmacy and Pharmacy 1's claims for dispensing high-adjudication foot bath medications, relying upon Oxford Premier Pharmacy's, Pharmacy 1's, **SPICER**'s, and Williams' representations that the high-adjudication foot bath medications were dispensed based upon valid prescriptions and were medically necessary.

o.      From in or around February 2017 through April 2020, Medicare reimbursed Oxford Premier Pharmacy approximately $694,464.80 for claims submitted for dispensing high-adjudication foot bath medications predicated upon prescriptions authorized by **SPICER**.

p.      From in or around March 2019 through August 2019, Medicare reimbursed Pharmacy 1 approximately $32,866.31 for claims submitted for dispensing high-adjudication foot bath medications predicated upon prescriptions authorized by **SPICER**.

43.      Additional manner and means by which **SPICER** and his co-conspirators sought to accomplish the objects and purpose of the scheme and artifice included, among other things:

14

## Molecular Diagnostic Testing

a.      In addition to his relationships with pharmacies, Power sought out and formed relationships with diagnostic laboratories whereby the laboratories would pay him a percentage of the reimbursements received for testing of biological specimens referred by Power.

b.      In or around January 2018, Power entered into an agreement with Laboratory 1 whereby Power would receive twenty-five percent of the reimbursements received by Laboratory 1 after billing health care benefit programs, including Medicare, for conducting molecular diagnostic testing referred by Power.

c.      **SPICER** agreed to send doctors' orders and biological specimens to Laboratory 1 in exchange for a share of the reimbursements received by Laboratory 1 for molecular diagnostic testing performed on the biological specimens.

d.      **SPICER** took toenail clippings and wound cultures from beneficiaries and others and directed his staff to send the toenail clippings and wound cultures to Laboratory 1, regardless of whether the molecular diagnostic testing of toenail clippings and wound cultures was medically necessary for the treatment of the individual patients.

e.      Specifically, **SPICER** and/or NMFS had arrangements with several nursing and group homes, where **SPICER** obtained biological specimens from large numbers of beneficiaries regardless of whether the individuals needed molecular diagnostic testing, sometimes obtaining over fifty biological specimens per nursing home and/or group home. **SPICER** also requested excessive testing of nursing home beneficiaries, often performing two biopsies per foot, or four biopsies per patient, and submitting all four biological specimens for molecular diagnostic testing.

15

f.      **SPICER** typically requested a barrage of molecular diagnostic testing on the biological specimens, including testing for highly unusual organisms such as *Bartonella henselae*, the bacteria that causes "cat scratch disease."

g.      Despite knowing that remuneration could not be paid or received for referring biological specimens to Laboratory 1 for beneficiaries, nevertheless, **SPICER** solicited and received remuneration, namely kickbacks and bribes, from Power in exchange for his referring biological specimens of beneficiaries to Laboratory 1.

h.      Laboratory 1 subsequently submitted electronic claims to Medicare and its sponsors, seeking reimbursement for the molecular diagnostic testing performed.

i.      From in or around April 2018 through May 2020, Laboratory 1 submitted approximately $1,806,763.25 in false and fraudulent claims to Medicare and was reimbursed approximately $269,004.77 for molecular diagnostic testing of biological specimens submitted by or on behalf of **SPICER**.

j.      From in or around January 2018 through in or around July 2020, Power paid approximately $6,600 in cash kickbacks to **SPICER** for the referral of orders for molecular diagnostic testing and the referral of prescriptions for high-adjudication foot bath medications.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATIONS

44.     Upon conviction of the offense set forth above, the defendant, **JARED LEE SPICER, D.P.M.**, shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to 18 U.S.C. § 982(a)(7).

16

45.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    a.     cannot be located upon the exercise of due diligence;

    b.     has been transferred or sold to, or deposited with, a third party;

    b.     has been placed beyond the jurisdiction of the Court;

    c.     has been substantially diminished in value; or

    d.     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

_____
CLAY JOYNER
United States Attorney

CLAYTON A. DABBS
Assistant U.S. Attorney
Northern District of Mississippi

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
United States Department of Justice

17